FILED
2023 Feb-07  AM 11:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| O.P., a minor, by and through her father and next friend, M.P., | ] | |
| Plaintiff, | ] | |
| v. | ] | 2:22-cv-0030-ACA |
| JEFFERSON COUNTY BOARD OF EDUCATION, | ] | |
| Defendant. | ] | |

## MEMORANDUM OPINION

O.P. is a young child with significant physical disabilities. She has serious difficulties with both gross motor skills like walking, jumping, and climbing, and fine motor skills like handwriting. To address these difficulties, and as required by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, each school year the Jefferson County School District and O.P.'s parents created individualized education plans setting out annual goals. The plans provided that the Jefferson County School District would provide physical therapy and occupational therapy as "related services" to help O.P. advance appropriately toward her annual goals. During O.P.'s first grade year, her parents requested a due process hearing on the ground that Defendant Jefferson County Board of Education had denied O.P. a free appropriate public education in kindergarten and first grade because the amount

of physical therapy and occupational therapy was inadequate to help O.P. reach her annual goals. The hearing officer found that the Board had not denied O.P. a free appropriate public education. In this lawsuit, O.P.'s father, Plaintiff M.P., challenges that determination.

Both parties move for judgment on the administrative record. Because the record supports the hearing officer's determination that the Board did not deny O.P. a free appropriate public education, the court **WILL DENY** M.P.'s motion and **WILL GRANT** the Board's motion.

## I.   LEGAL FRAMEWORK

The IDEA aims to provide "a free appropriate public education that emphasizes special education and related services" for all children with disabilities. 20 U.S.C. § 1400(d)(1)(A); *see also id.* § 1412(a)(1)(A) (requiring States that receive federal assistance under the IDEA to submit a plan ensuring that children with disabilities receive a free appropriate public education); *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1311 (11th Cir. 2003). A free appropriate public education includes both "special education and related services." 20 U.S.C. § 1401(9). Special education means "specially designed instruction . . . to meet the unique needs of a child with a disability." *Id.* § 1401(29). Related services are "such developmental, corrective, and other supportive services (including . . . physical and occupational therapy, recreation, . . . and medical services, except that such medical

services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education." *Id.* § 1401(26)(A).

To provide a free appropriate public education, the Board, working together with the child's parents, develops an individualized education plan ("IEP"). 20 U.S.C. § 1414(d)(1)(A)–(B); *M.M. ex rel. C.M. v. Sch. Bd. of Miami-Dade Cnty.*, 437 F.3d 1085, 1095 (11th Cir. 2006). An IEP is a written statement that sets out "measurable educational goals and special needs of the child, establishes how the child's progress will be measured and reported, and states the services available, based on peer-reviewed research, to enable the child to attain the goals, advance educationally, and participate with disabled and nondisabled children." *K.A. ex rel. F.A. v. Fulton Cnty. Sch. Dist.*, 741 F.3d 1195, 1201 (11th Cir. 2013) (footnote omitted); *see* 20 U.S.C. § 1414(d)(1)(A)(i).

If the child's parents object to the IEP, they can file a due process complaint. 20 U.S.C. § 1415(b)(6); *M.M. ex rel C.M.*, 437 F.3d at 1096. After a due process hearing, the hearing officer issues his decision.  20 U.S.C. § 1415(f). Any party aggrieved by the hearing officer's decision may file a civil lawsuit in the district court. 20 U.S.C. § 1415(i)(2)(A). Although the civil lawsuit involves judicial review of an administrative decision, it differs in important ways from a typical administrative appeal. *See Walker Cnty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000); *see also M.M. ex rel. C.M.*, 437 F.3d at 1097

("[T]he federal action is an independent civil action and not merely a review of a state administrative decision . . . ."). The court should give "'due weight' to the [hearing officer's] decision, and must be careful not to substitute its judgment for that of the state educational authorities," *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1178 (11th Cir. 2014) (some quotation marks omitted), but the court "is free to accept the [hearing officer]'s conclusions that are supported by the record and reject those that are not so long as it explains any rejections," *L.J. by N.N.J. v. Sch. Bd. of Broward Cnty.*, 927 F.3d 1203, 1210 (11th Cir. 2019) (quotation marks omitted). In addition, the court is permitted to make findings about disputed facts based on a preponderance of the evidence. *Loren F. ex rel. Fisher*, 349 F.3d at 1313–14. Bearing this framework in mind, the court turns to the facts presented in this case.

## II.    BACKGROUND

O.P. is a young girl diagnosed with hydrocephalus (a condition involving accumulation of "excessive cerebrospinal fluid" in the brain), Dandy-Walker Malformation (a "congenital brain malformation involving the cerebellum and the fluid filled spaces around it"), cleidocranial dysplasia (a condition affecting teeth and bones), an open fontanel (an unfused space between the bones of the skull), a missing right clavicle, a small left clavicle, radioulnar synostosis (a "fusion of portions of the radius and ulna" in one arm), midfoot pronation, a narrow pelvis, hip

dysplasia, hypotonia (a "low state of muscle tone"), astigmatism, and strabismus hypertropia (in which one eye turns upward). (Doc. 11-20 at 1–2 ¶¶ 3–15).

In August 2020, O.P. enrolled in the Jefferson County School District as a kindergartner. (*Id.* at 3 ¶ 26; *see* doc. 11-30 at 90). Because of the COVID-19 pandemic, the school district offered students the option to participate in virtual instruction instead of in-person learning. (Doc. 11-20 at 3 ¶ 28; doc. 27-1 at 19). On the advice of O.P.'s physician, O.P.'s parents chose to participate in virtual instruction because her various diagnoses put her at a high risk for COVID-19. (Doc. 11-20 at 3 ¶ 29; doc. 27-1 at 19).

The 2020–2021 school year began on September 1, 2020. (Doc. 11-20 at 3 ¶ 31). In September, Wendy Speigle, a district-employed occupational therapist, reviewed O.P.'s preschool IEPs and wrote an "Occupational Therapy IEP Summary," in which she recommended providing O.P. with thirty minutes of occupational therapy once a month, to focus on "fine motor skills and effective handwriting strategies." (Doc. 11-30 at 62; *see also* doc. 27-1 at 48). In October, Mallory Lambeth, a school district physical therapist, performed an evaluation of O.P., finding that her strength and range of motion were within functional limits but that she fatigued when walking long distances and required supervision and increased time on stairs, as well as close supervision during physical education.

(Doc. 11-30 at 82). Ms. Lambeth recommended monthly physical therapy consults with O.P.'s teachers and staff. (*Id.*).

O.P.'s IEP team met in October 2020 and determined that O.P. needed occupational therapy "in the areas of fine motor skills and effective handwriting strategies" and physical therapy "in the areas of reducing fatigue, promoting safety, and participating in activities with peers." (Doc. 11-30 at 91). In the fine motor skills area, the IEP set a goal for O.P. to be able to independently write her first and last name in four out of five trials by October 2021. (*Id.* at 93). In the gross motor skills area, the IEP set a goal for O.P. to be "able to ambulate throughout the school environment on level and unlevel surfaces with safety and no loss of balance in 3/4 trials." (*Id.* at 94).

Under the IEP, the school agreed to provide direct occupational and physical therapy services once monthly for thirty minutes each. (Doc. 11-30 at 95). The IEP also provided that each week, the school's exceptional education teacher would provide O.P. with thirty minutes of specialized instruction "in the area of writing for writing her first and last name focusing on letter formation and pencil grip in small group or 1-on-1 setting" and thirty minutes of specialized instruction "in the area of gross-motor/mobility to promote safety when walking on level and unlevel surfaces, in a small group or 1-on-1 setting." (*Id.*). After the IEP team's October 2020 meeting, an adapted physical education instructor recommended inclusion of adapted physical

education programming, so in November 2020 the team modified the IEP to include that recommendation. (Doc. 11-20 at 3 ¶¶ 36–38; *see also* doc. 11-30 at 109; doc. 11-31 at 2).

During the 2020–2021 school year, O.P. only received monthly occupational therapy services from Ms. Speigle over the internet. (Doc. 11-31 at 72, 78, 80, 82–86, 89; doc, 27-1 at 19–20, 49). Ms. Speigle testified that she "saw a general improvement in [O.P.'s] skills between sessions." (Doc. 27-1 at 50). O.P.'s special education teacher also noted improvement in O.P.'s ability to write her own name over the course of the school year. (Doc. 11-31 at 42, 45).

In May 2021, O.P.'s IEP team met to discuss transitioning her from virtual learning to traditional school. (Doc. 11-20 at 4 ¶ 40; doc. 11-31 at 54). Two months later, O.P.'s father, M.P., filed a due process complaint challenging, among other things, the amount of occupational and physical therapy offered to O.P. (Doc. 11-1 at 1, 13–18). The hearing officer held a due process hearing on November 17, 2021. (Doc. 27-1 at 1).

In the meantime, Ms. Speigle reevaluated O.P. in October 2021. (Doc. 11-32 at 39–40). She performed the evaluation in the controlled environment of the school's therapy room. (Doc. 27-1 at 51). Based on the "Beery Test of Visual Motor Integration," an informal handwriting assessment, and her own knowledge of the writing demands in first grade, Ms. Speigle found that O.P. needed occupational

therapy services "in the areas of fine motor, visual attention, handwriting, keyboarding, and self help skills." (Doc. 11-32 at 40; *see* doc. 27-1 at 61). She defined "self help skills" to include a child's ability to "[tie] shoes, manag[e] [her] own clothes for toileting, open[ ] packages in the lunchroom." (Doc. 27-1 at 53).

At O.P.'s due process hearing, Ms. Speigle testified that she knew before she did the reevaluation that O.P. would need more occupational therapy than she had received in kindergarten because the demands on students are higher in first grade than in kindergarten. (Doc. 27-1 at 61). Specifically, kindergarten focuses on writing letters, while first grade focuses on simple sentences. (*Id.* at 55). After O.P.'s reevaluation, Ms. Speigle recommended that the school increase the amount of direct occupational therapy from thirty minutes monthly to thirty minutes weekly. (Doc. 11-32 at 40; *compare* doc. 11-30 at 95). The direct occupational therapy services would focus on "fine motor activity with an academic slant to it that can improve hand dexterity, hand strength, grip strength, that is helpful in her reaching her writing—her written expression goal." (Doc. 27-1 at 56). Ms. Speigle's recommendation was based on O.P.'s level of function and the need to limit "pull-out time for services so that she is not missing as much time in the general education curriculum, whole-group time and instructional time." (*Id.* at 55).

In early October 2021, Christine Jones, a school district physical therapist, reevaluated O.P. by observing her during lunch, recess, and her adapted physical

education class. (Doc. 11-32 at 41–43; Doc. 27-1 at 70–71). Ms. Jones determined that O.P. could walk safely and independently on level surfaces throughout the school building, up and down a curb, and on slightly unlevel surfaces such as the playground. (Doc. 11-32 at 42). The school had no stairs that O.P. would have to climb during the school day, but the gymnasium had three steps that O.P. could climb up without the use of the handrail and could climb down with the use of the handrail. (*Id.*). However, "due to medical concerns," O.P. needed adult supervision throughout the day and during physical education and recess. (*Id.* at 43). Ms. Jones found that, based on the Berg Balance Scale, O.P. had a "low fall risk." (*Id.*).

Based on this reevaluation, Ms. Jones recommended once monthly consultative physical therapy. (Doc. 11-32 at 43). Consultative physical therapy would require Ms. Jones to meet and confer with O.P.'s general education teacher, special education teacher, physical education teacher, and paraprofessional, but would not involve any work directly with O.P. unless an issue presented itself. (Doc. 27-1 at 72).

The IEP team met on October 5 and October 12, 2021 to conduct an annual review of O.P.'s IEP. (Doc. 11-20 at 4 ¶¶ 54–55; doc. 27-1 at 22). The 2021 IEP found that O.P. had met the 2020 IEP's goals of (1) independently writing her first and last name in four out of five trials with 80% accuracy and (2) ambulating safely through the school environment on level and unlevel surfaces with no loss of balance

but with adult supervision. (Doc. 11-32 at 49). The 2021 IEP further found that O.P.'s handwriting had improved but she needed a model to write her responses and required more time to provide answers. (*Id.* at 48–49). It set new goals for O.P., including: (1) being able to write numbers up to fifty, in four out of five trials, with 80% accuracy; and (2) being able to write simple sentences that convey meaning, with and without a model, in four out of five trials. (Doc. 11-32 at 54–55).

Under the IEP, each week O.P. would receive four thirty minute sessions of specialized instruction from the exceptional education teacher focusing on math, including writing numbers; four thirty minute sessions focusing on reading; two thirty minute sessions focusing on writing simple sentences; and one weekly session of adapted physical education to work on motor skills. (*Id.* at 57). Each week, she would receive one thirty minute session of occupational therapy. (*Id.* at 57). And each month, she would receive one monthly thirty minute session of physical therapy (which, in excess of Ms. Jones's recommendation, would be a direct service instead of a consultative service). (*Id.* at 57–58). The IEP also provided for other accommodations, such as additional time to complete assignments, shorter assignments, fewer answer choices, oral responses when appropriate, and the availability of a touchscreen computer. (*Id.* at 58–59).

Shortly after the IEP team met, Katie Beaton, an independent physical therapist who began treating O.P. when she was three years old, evaluated O.P. at

her parents' request. (Doc. 11-32 at 64; doc. 27-1 at 23, 38). Ms. Beaton performed

the evaluation in a controlled environment, not at school. (Doc. 27-1 at 40, 45). She

found that O.P. was able to walk independently on all surfaces but had decreased

confidence on uneven surfaces; she was able to climb a few steps without a railing

but needed the railing afterward, and she could not descend the stairs with an

alternating gait unless she used the railing. (Doc. 11-32 at 65; doc. 27-1 at 39). She

also found that O.P. was "a fall risk for situations such as stairs, uneven surfaces,

playground equipment." (Doc. 11-32 at 65). Ms. Beaton testified that O.P.'s

difficulties with locomotion affected her ability to access her education because it

made interacting with friends on the playground or maneuvering through a

lunchroom with a tray difficult. (Doc. 27-1 at 41).

Ms. Beaton recommended two monthly physical therapy sessions of sixty

minutes each so that O.P. could meet the goals of being able to ascend and descend

stairs using alternating feet without a railing; being able to walk in line with

classmates at the same speed; and being able to play safely on playground

equipment. (Doc. 11-32 at 65–66; *see* doc. 27-1 at 43 (testifying that these goals

were necessary for O.P.'s education)). Ms. Beaton testified that she did not believe

thirty minutes of physical therapy once per month would allow O.P. to access her

education and the goals she set were intended to advance O.P. to the maximum

possible extent. (Doc. 27-1 at 42, 45).

Later that month, Nicole Rollier, an independent occupational therapist who began treating O.P. when she was ten weeks old, also completed an evaluation of O.P. (Doc. 27-1 at 23, 27–28). Like Ms. Speigle, she did the Beery Test of Visual-Motor Integration as well as a handwriting evaluation. (*Id.* at 29–31). She found that O.P. could write her first name with difficulty, though she improved when given a visual guide. (Doc. 11-32 at 68; doc. 27-1 at 31). O.P. could not write the sentence, "The quick brown fox jumped over the lazy dog": her writing was outside the lines on the paper, she switched her motor patterns and the hand she was using, she had difficulty with letter formation, and she gave up the attempt after three words. (Doc. 11-32 at 68; doc. 27-1 at 31).

Ms. Rollier recommended twice weekly thirty minute school-based occupational therapy to address "motor planning, strength/endurance, visual-motor integration, visual-motor coordination and writing and self help skills." (Doc. 11-32 at 69). She also recommended outpatient occupational therapy twice monthly for sixty minutes to assist with visual motor integration/coordination and handwriting. (*Id.*). Ms. Rollier opined that Ms. Speigle's recommendation of once weekly thirty minute occupational therapy was insufficient because O.P.'s deficit was "pretty significant . . . , which directly affects her academics. Reading, writing, math, all of those skills. And so I think to maximize her potential . . . . she absolutely needs outpatient and school system therapy." (Doc. 27-1 at 34–35).

The hearing officer held the due process hearing on November 17, 2021. (*Id.* at 1). At the hearing, O.P.'s mother, M.J.P., testified that contrary to the statement in the 2021 IEP, O.P. could not write her last name; her writing of her first name was "barely legible"; and she could not write even simple three-word sentences. (*Id.* at 15–16; *see also id.* at 59). She also could not zip or unzip shoes, zip up a jacket unless someone else got the zipper started, or manipulate buckles or clothing with snaps. (*Id.* at 17). M.J.P. further testified that because of O.P.'s open fontanel and fragile bones, a minor fall could cause a traumatic brain injury. (Doc. 27-1 at 14). O.P. was required to wear a helmet when she was younger, but no longer wore one by the time of the due process hearing. (*Id.* at 23).

At the hearing, M.J.P. played videos of O.P. showing: (1) O.P. walking with a marching gait on the school's playground, stumbling slightly on the uneven ground (doc. 27-1 at 10; PX05A[1]); (2) O.P. briefly interacting with another student, attempting to climb on the playground equipment, and tripping and falling to her hands and knees (doc. 27-1 at 10–11; PX05B); (3) O.P. attempting to sit with the teachers, who encouraged her to return to the playground (doc. 27-1 at 11; PX05C); (4) O.P. walking up some stairs without a handrail (doc. 27-1 at 7–8; PX07A); (5) O.P. walking down some stairs without a handrail but with significant difficulty

---

[1] The videos were submitted conventionally under seal. (Doc. 10). The court cites them using the same labels given in the notice of conventional filing.

(doc. 27-1 at 8; PX07B); and (6) O.P. stepping onto and jumping off a box step with the assistance of an adult and with great hesitance (doc. 27-1 at 8–9; PX08A). All the videos were recorded in the summer of 2021, between O.P.'s kindergarten and first grade years. (Doc. 27-1 at 9, 11).

At the due process hearing, Ms. Jones (the school's physical therapist) testified that she had reviewed Ms. Beaton's independent physical therapy evaluation. (*Id.* at 73). Ms. Jones noted that Ms. Beaton's evaluation was very similar to her own, but she disagreed with Ms. Beaton's recommendation that the school should provide two monthly sixty-minute sessions or pay for outpatient physical therapy. (*Id.* at 73–74). She testified that, while more physical therapy would certainly benefit O.P., the school-provided physical therapy of one monthly thirty-minute visit was sufficient to allow O.P. to be safe and independent in the school environment, especially when considered in conjunction with O.P.'s adapted physical education, which also focused on gross motor skills in the areas of balance, strength, and hand/eye coordination. (*Id.*).

Similarly, Ms. Speigle testified that she had reviewed Ms. Rollier's occupational therapy evaluation. (Doc. 27-1 at 57). She, too, concluded that Ms. Rollier's evaluation was similar to hers but disagreed with the extent of school-based occupational therapy recommended. (*Id.*). She testified that her recommendation of one sixty minute session per week, in conjunction with

consultation with the classroom staff and special education manager, was sufficient to address O.P.'s educational needs. (*Id.* at 57–58). She testified that outpatient physical therapy is aimed at medical improvement, but school-based occupational therapy is directed at reaching the goals set out in the IEP. (*Id.* at 63).

O.P.'s first grade teacher, Ashley Barnes, testified that, in addition to occupational and physical therapy, O.P. received special education services and assistance on tests. (Doc. 27-1 at 78, 84). Ms. Barnes felt that additional therapy sessions could impact O.P.'s progress in class because each therapy session meant she was not receiving in-class instruction, either with the whole class or in small groups. (*Id.* at 86). Ms. Barnes had already noticed progress with O.P.'s handwriting, and she also offered O.P. accommodations like providing lines on the paper, more space for answers, or accepting oral responses. (Doc. 27-1 at 79, 80, 83–84).

As far as gross motor skills, Ms. Barnes testified that O.P. could navigate through the school. (Doc. 27-1 at 81). O.P. sometimes "veer[ed]" when walking on her own but always had the option to hold Ms. Barnes' hand, in which case she could usually walk in a straight line. (*Id.*). In the "week or two" before the hearing, Ms. Barnes had noticed O.P. walking with her shoulder on the wall, but she had not yet had a chance to discuss that development with Ms. Jones. (*Id.*).

The hearing officer concluded that the Board had not denied O.P. a free appropriate public education in either kindergarten or first grade with respect to

either occupational therapy or physical therapy. (Doc. 11-40 at 8–17). He found that the IEP team set the occupational therapy requirements based on knowledge of O.P.'s specific deficits, focused on handwriting in kindergarten because self-help skills like buttoning and snapping were too difficult to do remotely, and offered other therapies, consultations, and specialized education that would spill over into the same territory as occupational therapy. (*Id.* at 10–13). With respect to physical therapy, the hearing officer found that the school was not required to treat or rehabilitate O.P.'s disabilities, the IEP was based on prospective judgment and did not have to aim to maximize a student's progress, and O.P.'s lack of progress did not necessarily show that the goals were inadequate when they were formed. (*Id.* at 16–17).

M.P. then filed this case challenging "all issues on which [he] did not prevail in [the] hearing officer['s] decision." (Doc. 13 at 24 ¶ 78). M.P. seeks a finding that the Board denied O.P. a free appropriately public education, an award of compensatory education, and attorney's fees and costs. (*Id.* at 27 ¶¶ 93–101).

## III.   DISCUSSION

The parties have both moved for judgment on the administrative record. (Docs. 22, 23). M.P. contends that the Board denied O.P. a free appropriate public education by failing to adequately evaluate O.P.'s need for physical and occupational therapy and by failing to provide sufficient physical and occupational

therapy during her kindergarten and first grade years. (Doc. 22 at 18–30). The Board contends that it provided all the occupational and physical therapy necessary for O.P. to access her education. (Doc. 23 at 21–31).

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). Because "crafting an appropriate program of education requires a prospective judgment by school officials," a court reviewing the adequacy of an IEP "must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* (emphasis in original). "[F]or a child fully integrated in the regular classroom," reasonableness typically means the IEP is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade" or "to permit advancement through the general curriculum." *Id.* at 999–1000 (quotation marks omitted).

The IEP must seek to enable "more than *de minimis*" progress. *Id.* at 1000. But a school is not required to offer or provide the "'best' program" or to maximize a child's potential. *M.M. ex rel. C.M.*, 437 F.3d at 1102; *see also Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 1001 (rejecting the argument that a free appropriate education is one "that aims to provide a child with a disability opportunities to achieve academic success, attain self-sufficiency, and contribute to society that are

substantially equal to the opportunities afforded children without disabilities"); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 189 (1982) (explaining, in a case about the predecessor statute to the IDEA, that "if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, . . . the child is receiving a 'free appropriate public education' as defined by the Act").

### 1.  Occupational Therapy

M.P. contends that the Board denied O.P. a free appropriate public education in kindergarten because (1) Ms. Speigle did not evaluate O.P. in preparation for the 2020 IEP; and (2) Ms. Speigle did not work on self-help skills like snapping and buttoning during O.P.'s kindergarten year. (Doc. 22 at 18–20). M.P. argues that the Board denied O.P. a free appropriate public education in first grade because O.P.'s handwriting and other fine motor skills have not progressed adequately. (*Id.* at 20–23; doc. 24 at 10–13, 16–25).

For its part, the Board contends that (1) Ms. Speigle's October 2020 recommendation about the amount of occupational therapy the school should offer to O.P. was based on O.P.'s previous records, even though she did not do an in-person evaluation; (2) the other services, including specialized education and teacher-therapist consultation, buttressed the direct occupational therapy services; (3) progress is not dispositive in showing the denial of a free appropriate public

education, but even so, O.P. has made progress; (4) more out-of-classroom time could harm O.P.'s progress; and (5) Ms. Rollier's recommendations stem from a goal of maximizing O.P.'s potential and addressing O.P.'s medical, rather than educational, needs. (Doc. 23 at 21, 23–28; doc. 25 at 19–20, 24–27).

O.P. has not shown a denial of her right to a free appropriate education in either kindergarten or first grade based on the amount of occupational therapy provided by the school. The evidence shows that, although Ms. Speigle did not do an independent evaluation of O.P. before the creation of the 2020 IEP, she reviewed O.P.'s previous and unchallenged IEPs. (Doc.27-1 at 48). The court further finds no reason to disregard the hearing officer's finding that "[a] review of the IEPs and transcript would indicate that Ms. Speigle did indeed have knowledge of [O.P.]'s specific deficits." (Doc. 11-40 at 11). Likewise, O.P. has not shown by a preponderance of the evidence how the IEP's failure to address—or Ms. Speigle's failure to work on—"self-help" skills like buttoning, snapping, and zipping denied her a free appropriate education, given that O.P. can wear clothing that does not have buttons, snaps, or zippers, or can seek the assistance of a teacher if she does wear clothing or shoes that she cannot manipulate on her own.

Finally, given the evidence in this case and the prospective nature of drafting IEPs, O.P.'s progress (or lack of progress) is insufficient to show that the IEPs were not reasonably calculated to enable O.P. to advance. *See Endrew F. ex rel. Joseph*

*F.*, 137 S. Ct. at 999–1000. Even if O.P.'s progress were *de minimis*—which the court does not find on this record—a lack of progress is not dispositive. *Cf. L.J. by N.N.J.*, 927 F.3d at 1214 (holding, in a case challenging the implementation of an IEP, that "[a] child's actual educational progress (or lack thereof) can be evidence of the materiality of an implementation failure—but it is not dispositive. . . . [S]ome evidence of success—or failure—in achieving certain outcomes is not outcome-determinative here any more than it is in a [case challenging the content of an IEP].")."). It is an unfortunate reality that "the IDEA cannot and does not promise any particular educational outcome. No law could do that—for any child." *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 998 (cleaned up).

Because M.P. has not shown the denial of a free appropriate public education in either kindergarten or first grade based on the provision of occupational therapy services, the court **WILL DENY** M.P.'s motion for judgment on the administrative record and **WILL GRANT** the Board's motion.

2.  Physical Therapy

M.P. contends that the Board denied O.P. a free appropriate public education in kindergarten and first grade because (1) Ms. Jones's evaluation of O.P.'s fall risk was based on an evaluation in a controlled environment instead of an uncontrolled environment like a school hallway or playground or in light of O.P.'s tendency to fall when fatigued; (2) O.P. has not progressed in her ability to ambulate in all the

scenarios she encounters during a school day, denying her full access to her education; and (3) the Board erroneously relied on a false distinction between "medical" and "educational" purposes in declining to provide more physical therapy to O.P. (Doc. 22 at 24–30; doc. 24 at 14–16, 27–32).

The Board contends that it satisfied its obligation to prepare adequate IEPs because (1) O.P.'s parents elected virtual learning for O.P.'s kindergarten year and did not tell Ms. Lambeth during that year that O.P. needed anything more than she was receiving; (2) the IEP team considered that more out-of-classroom time could harm O.P.'s educational goals; (3) Ms. Beaton's recommendations seek to maximize O.P.'s potential and address her medical, rather than her educational, needs; and (4) the reasonableness of the IEP cannot be judged based on lack of progress. (Doc. 23 at 22, 25–26, 29–30; doc. 25 at 19, 28–29).

The court finds that O.P. has not proved by a preponderance of the evidence that the Board denied her a free appropriate public education based on the provision of physical therapy services. With respect to Ms. Jones' evaluation of O.P.'s fall risk, the evaluation and Ms. Jones' testimony indicate that the formal Berg Balance Scale test was conducted in a controlled environment (doc. 11-32 at 43), but Ms. Jones also observed O.P. "during lunch and recess, as well as adapted physical education" (*id.* at 41; doc. 27-1 at 70–71 ("I observed her in all facets of the school environment just to make sure that she could . . . access her school environment.").

21

With respect to O.P.'s progress, the court again finds that evidence presented in this case does not support M.P.'s suggestion that lack of progress establishes that O.P.'s IEPs were not reasonably calculated to *enable* progress, especially when considering the provision of adapted physical education intended to develop O.P.'s motor skills in "[a]ll school environments to include: gymnasium, hallway, playground, school track, school football field, classroom, auditorium, and therapy room." (Doc. 11-31 at 3; doc. 11-32 at 57); *see Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 999–1000; c*f. L.J. by N.N.J.*, 927 F.3d at 1214.

Finally, the court is not persuaded by M.P.'s argument regarding the medical/educational distinction. (*See* doc. 22 at 29–30; doc. 24 at 31–32). The court accepts the hearing officer's finding that, when drafting the IEP, the Board declined to offer additional physical therapy because it believed the amount of physical therapy offered was sufficient to enable O.P. to meet her annual goals. (*See* doc. 11-40 at 17). This is especially true when considering the provision of adapted physical education, which focused on many of the same gross motor skills (*see* doc. 11-31 at 3; doc. 11-32 at 57; doc. 27-1 at 73–74), and the balance the school must strike in providing pull-out services and in-classroom services (doc. 27-1 at 56, 86).

Because M.P. has not shown the denial of a free appropriate public education in either kindergarten or first grade based on the provision of physical therapy

services, the court **WILL DENY** M.P.'s motion for judgment on the administrative record and **WILL GRANT** the Board's motion.

## IV.   CONCLUSION

The court is deeply sympathetic to O.P.'s parents' wish for O.P. to receive services that will maximize her educational opportunities and cause her to progress in school at the same pace as her classmates. Unfortunately, the IDEA does not require a school district to maximize a child's potential, nor can it promise—or deliver—progress at any particular pace for any child. Because M.P. has not shown that the Board denied O.P. a free appropriate public education based on its provision of occupational and physical therapy, the court **WILL DENY** M.P.'s motion for judgment on the administrative record and **WILL GRANT** the Board's motion for judgment on the administrative record.

The court will enter a separate judgment consistent with this opinion.

**DONE** and **ORDERED** this February 7, 2023.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE